GEORGE S. BROWN, The. See Cases Nos. 1,889 and 1,890.

GEORGE'S CREEK, The (CREIGHTON v.). See Case No. 3,382.

GEORGE'S CREEK, The (REEDER v.). See Case No. 11,654.

GEORGE SKOLFIELD, The (BURGTHALL v.). See Case No. 2,155.

---

## Case No. 5,340.

### The GEORGE S. WRIGHT.

[Deady, 591.] [1]

District Court, D. Oregon. July 2, 1869.

PILOTAGE — STATE AND FEDERAL LICENSES — HALF PILOTAGE — REMEDY AGAINST CONSIGNEE.

1. By the act of February 25, 1867 (14 Stat. 411), a sea-going steam vessel, subject to the navigation laws of the United States, when navigating any of the waters thereof, is required to be in charge of a pilot licensed by the inspectors of steam vessels, but such act is cumulative, and does not annul or supersede a state law requiring that such pilot when piloting such vessel within the limits of the state, should also be licensed by the pilot commissioners of the state.

[Cited in The Alzena, 14 Fed. 175.]

2. Claims for half pilotage for offer and refusal of services, are cases of admiralty jurisdiction, and a suit therefor may be maintained against the vessel or master; and a state statute which provides that in a certain contingency the consignee shall also be liable therefor, does not affect the jurisdiction in admiralty, but only gives an additional remedy against a third person.

[Cited in The California, Case No. 2,312; Holmes v. Oregon & C. Ry. Co., 5 Fed. 84; The Glenearne, 7 Fed. 606; Sylvester v. The Edith Godden, 25 Fed. 512; McDonald v. Prioleau, 44 Fed. 770; The Allianca, 56 Fed. 613.]

3. Suggestions as to the regulations of pilot fees by congress rather than the state.

---

[1] [Reported by Hon. Matthew P. Deady, District Judge, and here reprinted by permission.]

In admiralty.

Joseph N. Dolph, for libellant.
Erasmus D. Shattuck, for claimant.

DEADY, District Judge. This suit is brought to recover $95 for half pilotage, claimed to be due the libellant on account of the offer of his services to pilot the Wright from the port of Astoria, over the bar of the Columbia river to the open sea, and the refusal of the same by the master, on January 14 and April 8, 1869.

From the pleadings and stipulation of the parties, the material facts appear to be as follows:

I. That on the dates aforesaid, and each of them, the libellant was duly qualified and authorized by the laws of the United States, and of the state of Oregon, to pilot the George S. Wright from the port of Astoria over the bar of the Columbia river to the open sea, and that on said dates respectively said libellant hailed said Wright at the port of Astoria, and offered to pilot her from said port across said bar to the open sea, but that the master of said vessel then and there refused to accept said offer or permit libellant to come on board or pilot said vessel.

II. That on the dates aforesaid, and each of them, the George S. Wright was a seagoing vessel, propelled by steam, engaged in carrying passengers, and bound on a voyage from Portland on Wallamet, to the foreign port of Victoria; and that Henry Langdon was then and there the master of said vessel, and duly qualified, licensed and authorized under the statutes of the United States in such cases made and provided, to pilot said vessel from the port of Astoria over said bar to the open sea, but was not so qualified or authorized under the statutes of Oregon, relating to pilots and pilotage on said river and bar or either of them.

III. That at the dates aforesaid, and each of them, said vessel proceeded on her voyage from the port of Astoria to the port of Victoria aforesaid, and was then and there piloted from Astoria aforesaid to the open sea by the master thereof; but that the libellant was the first pilot that then and there offered to pilot said vessel from Astoria to the open sea who was duly authorized and qualified therefor, under the laws of the state of Oregon, relating to pilots and pilotage upon said river and bar.

Upon this state of facts, is the libellant entitled to recover half pilotage for the offer and refusal of his services as aforesaid? As the law then stood and still remains, this question must be answered in the affirmative. A brief statement of the legislation and judicial decisions upon the subject will make this apparent.

On August 17, 1789 (1 Stat. 54), congress passed an act adopting the existing laws of the states regulating "pilots in the bays, inlets, rivers, harbors and ports of the United States," together with such laws as they might hereafter enact for that purpose, "until further legislative provision should be made by congress."

On August 30, 1852, congress passed an act relating to vessels propelled by steam, and carrying passengers on any of the navigable waters of the United States. Section 9 of this act (10 Stat. 63) declares:

"That instead of the existing provisions of law for the inspection of steamers and their equipments, and instead of the present system of pilotage of such vessels, and the present mode of employing engineers on board the same," certain regulations prescribed by that act shall be observed. One of these regulations is to the effect. that pilots for such vessels must be licensed and classified by United States inspectors; and another prohibits, under a penalty of $100, any person from employing, or any person from serving as pilot on such vessel without such license.

In The Panama [Case No. 10,702], this court decided, that under the act of 1852, a steam vessel carrying passengers anywhere upon the waters of the United States, must be under the charge of a pilot licensed under that act; and that the master of such vessel was prohibited from taking on a pilot anywhere, unless so licensed.

Three years afterwards, the supreme court of the United States, in Steamship Co. v. Joliffe, 2 Wall. [69 U. S.] 450, decided that the act of 1852 did not apply to port or bar pilots, and that, therefore, the state law regulating pilots in the bay of San Francisco was in nowise modified or affected by the act of 1852. As a matter of opinion simply, I have yet seen no reason to question the soundness of the conclusion arrived at in The Panama, but, of course this court is bound by the authority of Steamship Co. v. Joliffe, supra.

This was the state of the law upon the subject until July 25, 1866, when congress passed an act to provide for the safety of the lives of passengers on steam vessels. Section 9 of this act (14 Stat. 228) provides:

"That all vessels navigating the bays, inlets, rivers, harbors and other waters of the United States, except vessels subject to the jurisdiction of a foreign power and engaged in foreign trade, and not owned in whole or in part by a citizen of the United States, shall be subject to the navigation laws of the United States. * * *

"And every sea-going steam vessel now subject to the navigation laws of the United States, * * * shall, when under way, except upon the high seas, be under the control and direction of pilots licensed by the inspectors of steam vessels; * * *."

By the enactment of this provision congress has declared that the construction given to the act of 1852, by this court in The Panama shall prevail. so that, "except upon the high seas," or stated conversely, upon the

navigable waters of the United States, including ports and harbors, a sea-going steam vessel must be under the direction of a pilot licensed under the act of 1852, and not otherwise.

On February 25, 1867, the act of July 25, 1866, was amended by re-enacting section 9 thereof (14 Stat. 411) with the following proviso:

"That nothing in this act, or in the act of which it is amendatory, shall be construed to annul or affect any regulation established by the existing law of any state requiring vessels entering or leaving a port in such state to take a pilot duly authorized by the laws of such state, or of a state situate upon the waters of the same port."

This is the latest congressional enactment upon the subject. In my judgment this proviso does not change the legal effect of section 9 of the act of 1866. A sea-going steam vessel anywhere upon the navigable waters of the United States, whether "entering or leaving a port," must still be under the direction and control of a pilot licensed by the inspectors of steam vessels.

But on the other hand, the act of congress, with or without the proviso, does not annul or abrogate the state laws, concerning pilots and pilotage in the ports and harbors, except so far as the latter may conflict or be inconsistent with the former. The former in effect prohibits a mere state pilot from piloting a sea-going steamer in the port or elsewhere upon the navigable waters of the United States. But if the pilot be licensed by the United States inspectors, then the act of congress is satisfied and does not exclude the operation of state laws providing additional regulations upon the subject of pilots and pilotage. In short, the act of congress is merely a cumulative provision. It annuls nothing, but adds an additional qualification, in the case of pilots, piloting sea-going steamers.

The state regulations upon the subject of pilots and pilotage between Astoria and the open sea are contained in an act for the establishment of a pilotage upon the Columbia and Wallamet rivers, passed October 17, 1860 (Code Or. 839), with the amendments thereto.

It provides for the creation of a board of pilot commissioners, who are authorized to examine and license pilots on the Columbia river and bar below Astoria, and prescribes their qualifications, duties and compensation. Any such pilot is authorized to take charge of any vessel, not less than twenty-five tons burden, bound in or out of the Columbia river. The master of such vessel may, if he choose, pilot her in or out of the river, "but he shall, notwithstanding, when bound into the river, pay to such pilot, as shall first offer his services outside the bar, full pilotage, * * * and if bound out, one half pilotage." If the "master omit or refuse to pay the pilotage fees in any in-

stance, * * * then his consignee shall become liable for the same."

These regulations are not inconsistent with the acts of congress upon the same subject. They can stand together and be obeyed by the same person at the same time. Taken together, they constitute the law governing the pilotage of steam vessels on the pilot grounds of the Columbia river, below Astoria.

By virtue of the acts of congress a steam vessel, "when under way," elsewhere than "upon the high seas"—that is, beyond the territorial jurisdiction or dominion of the United States—must be under the control of a pilot licensed by the United States inspectors. This provision is imperative, a pilot without such license is not authorized to pilot such vessel. But a pilot with this qualification alone, is not, so to speak, a full pilot, on these pilot grounds. Before he is authorized to offer his services to such vessel, and in case of refusal, to demand whole or half pilotage, as the case may be, he must also be qualified under the state laws.

This conclusion accords with the following suggestion made by this court in The Panama [supra]. "The law (act of 1852) only so far abrogates the state law as to require that a steam vessel carrying passengers, shall have a pilot licensed by its authority, and to prohibit any pilot without such license from serving as pilot on such vessel. The compensation of pilots, the mode and manner of offering their services, until congress sees proper to provide for them, still remains legitimate subject for state legislation. The bar pilot, licensed by the state, may apply to the United States inspectors for license to pilot steam vessels, and, if found competent and licensed, may pilot such vessels."

This disposes of the case upon the merits. The libellant being qualified under both the national and state law, was the first pilot so qualified to hail the Wright and offer his services as a pilot. His offer being refused by the master, he is entitled to recover half pilotage. By the state pilot law, approved October 27, 1868, the fees for pilotage were reduced, so that the libellant is only entitled to $36 instead of $46 as claimed for each voyage.

The answer of the claimant also contains an article in the nature of a peremptory exception to the libel. This allegation is to the effect, that the state law giving half pilotage expressly makes the consignee of the ship liable therefor in case the master omits or refuses to pay the same, and that therefore the vessel is not liable also for the demand. But I do not think the statute can or ought to have such a construction.

A claim for half pilotage given by statute for services offered and refused, so far as the remedy is concerned, stands upon the same footing as an ordinary claim for pilotage. The transaction out of which the libellant's claim arises, is one from which the law will

imply a contract to pay the pilotage given by statute, as a compensation for the offer of services with a present ability to perform. Steamship Co. v. Joliffe, 2 Wall. [69 U. S.] 456.

Claims for pilotage are cases of admiralty jurisdiction, and the suit therefor may be against the vessel or against the master or owner, or both. Ben. Adm. 289, 391. The law of the state cannot take away or limit the admiralty jurisdiction of this court, if it would. On the other hand it is evident that the remedy given by the local law against the consignee was intended to be cumulative and not restrictive. A claim for half pilotage against an outgoing vessel, without an owner resident in this district, might otherwise be practically incapable of recovery. To meet such a case, the pilot act of the state gives the pilot an additional remedy against the consignee—a person supposed to be resident in the port.

As has been shown the law of this case is with the libellant. The legislation upon the subject of pilots and pilotage is practically still left with the states—except that, so far as steam vessels are concerned—the pilot must be licensed by United States inspectors. But it is to be regretted that congress has not gone farther in the exercise of its undoubted powers to regulate commerce both foreign and domestic, and established some uniform rules in regard to the amount and mode of payment of pilot fees. The regulations made by the state are generally at the instigation and in the special interest of the local pilots, and at the expense of steam vessels, especially if owned without the district. In such cases, at least, where pilotage is ordinarily a mere tax for nominal and unnecessary services, the United States inspectors with the supervising inspector ought to be authorized to prescribe and establish the fees for pilotage.

There must be a decree given for the libellant for the sum of $72 and costs and expenses of suit.